Matthew G. Berkowitz (SBN 268873)
  mberkowitz@reichmanjorgensen.com
Michael M. Polka (SBN 351136)
  mpolka@reichmanjorgensen.com
REICHMAN JORGENSEN LEHMAN &
  FELDBERG LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
Tel.: (650) 623-1401

Timothy A. Trost (SBN 340843)
  ttrost@reichmanjorgensen.com
REICHMAN JORGENSEN LEHMAN &
  FELDBERG LLP
3020 Old Ranch Parkway, Suite 300
Seal Beach, CA 90740
Tel: (650) 623-1401

Connor S. Houghton (*pro hac vice*
  forthcoming)
  choughton@reichmanjorgensen.com
Savannah Carnes (SBN 335438)
  scarnes@reichmanjorgensen.com
Natalie Griffin (*pro hac vice* forthcoming)
  ngriffin@reichmanjorgensen.com
REICHMAN JORGENSEN LEHMAN &
  FELDBERG LLP
1909 K Street, N.W., Suite 800
Washington, D.C. 20006
Tel.: (202) 894-7310

*Attorneys for Plaintiff Crestwood I-A LLC*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRESTWOOD I-A LLC,<br><br>                Plaintiff,<br><br>        v.<br><br>SONOS, INC.,<br><br>                Defendant. | Civil Action No. 2:26-cv-05476<br><br>**COMPLAINT FOR PATENT INFRINGEMENT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Crestwood I-A LLC, by and through its undersigned counsel, brings this complaint against Defendant Sonos, Inc. to hold Sonos accountable for its infringement of Plaintiff's patented technology. The Court has jurisdiction over this patent infringement action under 28 U.S.C. §§ 1331 and 1338(a). Plaintiff alleges as follows:

### PARTIES

1.     Plaintiff Crestwood I-A LLC is the owner of foundational technology relating to speaker calibration techniques that was originally invented by Intertrust Technologies Corporation. Plaintiff is a Texas limited liability company.

2.     On information and belief, Defendant Sonos, Inc. is a Delaware corporation with its principal place of business at 301 Coromar Drive, Goleta, CA 93117, which is Sonos's corporate headquarters.

### JURISDICTION AND VENUE

3.     This action for patent infringement arises under the laws of the United States, 35 U.S.C. § 101. This Court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1338(a) because it is a civil action arising under the Patent Act.

4.     This Court has personal jurisdiction over Sonos based on both general and specific jurisdiction. Sonos is headquartered in this District, where it regularly conducts business and designs the accused products. Sonos has also directly and indirectly infringed the Asserted Patents in this District and continues to do so.

5.     Venue is proper over Sonos in this District based on 28 U.S.C. §§ 1391 and 1400(b) because Sonos resides in this District. Sonos also has a regular and established place of business in this District and has committed acts of infringement in this District.

### THE ASSERTED PATENTS

6.     Plaintiff is the exclusive owner by assignment of all rights, title, and interest in U.S. Patent Nos. 9,438,996; 9,883,315; 10,244,340; 10,827,294; 11,350,234; 11,729,572; and 12,185,078 (collectively the "Asserted Patents"). The Asserted Patents

were developed by inventors from Intertrust, a Silicon Valley company founded in 1990 that has developed numerous innovative and diverse technologies, including groundbreaking innovations relating to speaker calibration techniques.

7.      The Asserted Patents share a common specification and priority date of February 21, 2012, and are directed to systems and methods for calibrating speakers. The claims are directed to various technical improvements in the calibration and operation of audio playback systems. The Asserted Patents each name David Maher, Gilles Boccon-Gibod, and Steve Mitchell from Intertrust as inventors.

8.      The '996 Patent was duly and lawfully issued on September 6, 2016. A true and correct copy is attached as Exhibit 1. The '996 Patent has been in full force and effect since its issuance. Plaintiff is the owner and assignee with all right, title, and interest to the '996 Patent, including the right to seek damages for infringement.

9.      The '315 Patent was duly and lawfully issued on January 30, 2018. A true and correct copy is attached as Exhibit 2. The '315 Patent has been in full force and effect since its issuance. Plaintiff is the owner and assignee with all right, title, and interest to the '315 Patent, including the right to seek damages for infringement.

10.      The '340 Patent was duly and lawfully issued on March 26, 2019. A true and correct copy is attached as Exhibit 3. The '340 Patent has been in full force and effect since its issuance. Plaintiff is the owner and assignee with all right, title, and interest to the '340 Patent, including the right to seek damages for infringement.

11.      The '294 Patent was duly and lawfully issued on November 3, 2020. A true and correct copy is attached as Exhibit 4. The '294 Patent has been in full force and effect since its issuance. Plaintiff is the owner and assignee with all right, title, and interest to the '294 Patent, including the right to seek damages for infringement.

12.      The '234 Patent was duly and lawfully issued on May 31, 2022. A true and correct copy is attached as Exhibit 5. The '234 Patent has been in full force and effect since its issuance. Plaintiff is the owner and assignee with all right, title, and interest to the '234 Patent, including the right to seek damages for infringement.

2

13.    The '572 Patent was duly and lawfully issued on August 15, 2023. A true and correct copy is attached as Exhibit 6. The '572 Patent has been in full force and effect since its issuance. Plaintiff is the owner and assignee with all right, title, and interest to the '572 Patent, including the right to seek damages for infringement.

14.    The '078 Patent was duly and lawfully issued on December 31, 2024. A true and correct copy is attached as Exhibit 7. The '078 Patent has been in full force and effect since its issuance. Plaintiff is the owner and assignee with all right, title, and interest to the '078 Patent, including the right to seek damages for infringement.

## FACTUAL BACKGROUND

### *Pioneering Mobile-Driven Speaker Calibration Solves a Long-Standing Problem.*

15.    Plaintiff's Asserted Patents arise from pioneering work undertaken at Intertrust, a Silicon Valley technology company with decades of experience inventing advanced software and Internet technologies.

16.    In 2012, Intertrust's inventors recognized a growing industry problem: modern listeners increasingly used portable devices in diverse rooms and layouts where speaker placement, room geometry, and furnishings degraded audio quality, yet there was no simple, effective way for everyday users to calibrate speakers for each unique environment. *See* Ex. 8 (Trueplay Spectral Correction, https://tech-blog.sonos.com/posts/trueplay-spectral-correction/).

17.    To address this problem, the inventors conceived and reduced to practice novel methods and systems that leverage a portable microphone, like the ones found in portable electronic devices, to capture room responses at multiple locations and automatically compute room-specific adjustments that improve playback fidelity. The shared specification explains how the system determines calibration parameters— including using the device's system information file to account for the microphone's transfer function—so that the resulting filters are tailored to both the room and the

sensing hardware. *E.g.*, '996 Pat.[1] at 2:30-62, 4:34-5:4.

18.     The Asserted Patents describe practical, user-friendly embodiments that made these advances accessible to consumers, including workflows in which a user downloads an app, plays test tones through their speakers, and walks the microphone to different listening positions so the system can measure and correct for the environment's acoustic effects. *E.g.*, '996 Pat. at 1:24-53. These embodiments were designed to solve real-world problems with real-world, hardware-anchored steps—not abstract theorizing—so that anyone could achieve high-quality sound without specialized equipment. The patents claim various embodiments and aspects of this invention.

19.     From the outset, the inventors identified network-connected speakers as a prime implementation, expressly noting applicability to speakers "such as those made and distributed by Sonos." *Id.* at 2:53-54. The patents disclose and claim technology that directly addresses calibration in connected-speaker ecosystems and anticipated the very use cases at issue here.

***The Asserted Patents are Directed to Concrete Technical Solutions that Were Not Well-Understood, Routine, or Conventional in 2012.***

20.     The Asserted Patents arise from a concrete and longstanding technological problem in audio engineering: the inability of conventional systems to reliably reproduce sound such that it is encountered as intended once deployed in real-world environments. *See* '996 Pat. at 1:24-53. As the shared specification explains, the quality of audio played back is significantly degraded by physical factors such as room geometry, surface materials, speaker placement, and listener position. *Id.* at 1:24-35. These factors introduce measurable distortions—including reflections, phase irregularities, and channel imbalances—that vary from one environment to another and cannot be corrected using fixed or preconfigured settings. *Id.* at 1:24-35, 4:59-65, 5:20-

---

[1] Pinpoint citations are to the specification of the '996 Patent, but all Asserted Patents share a common specification.

27.

21.    At the same time, the way users consumed audio was fundamentally changing at the time of the invention. Music and other content was becoming highly portable, with playback occurring across a wide range of environments using mobile devices and network-connected speaker systems. *Id.* at 1:35-48. These environments were rarely configured for optimal acoustics, yet prior calibration techniques were not designed to address this variability. *Id.* at 1:24-53; 2:35-38. Instead, they were "cumbersome, inconvenient, and expensive," often requiring specialized equipment and expertise, and were therefore impractical for ordinary users or dynamic environments. *Id.* at 2:35-46. As a result, conventional systems lacked any practical mechanism for generating accurate, environment-specific calibration data using the non-calibrated microphones and distributed playback systems available to ordinary users. *See id.* at 2:30-45.

22.    The Asserted Patents address this problem by introducing a specific, implementable calibration architecture that operates on acoustic signals within the user's actual environment. *See id.* at 1:48-53, 2:30-62. The inventions leverage hardware that is already present in modern speakers and portable devices, and coordinate and order those components in an unconventional manner to perform detailed acoustic measurements, compute environment-specific corrections, and apply those corrections to subsequent audio playback. *See id.*

23.    The disclosed systems and methods implement a structured acoustic measurement process designed to generate usable calibration data from non-calibrated hardware in uncontrolled environments. They cause one or more speakers to emit test signals into the physical environment and use a microphone (typically integrated into a portable device) to capture how those signals are actually received in that environment. *See id.* at cl. 1. Because the captured signal reflects the combined and interacting effects of the speakers, the room, and the listener's position, it provides a direct, measured representation of the system's real-world acoustic behavior. *See id.* at

5

1:24-53. To further improve the accuracy of these measurements, the system and methods perform the capture process at multiple defined physical locations, in some modes including at positions proximate to a user's ears, thereby obtaining acoustic data spatially relevant to the listener's experience. *See id.* at 4:34-52. This measurement process produces system-specific data generated by the system's calibration technique.

24.     The inventions further recognize and solve a technical obstacle that prevented prior systems from using consumer devices for accurate measurement: microphones embedded in portable devices introduce their own device-specific distortions. *Id.* at 4:66-5:4. For example, a claimed method expressly requires "accessing a system information file of the portable device to determine a transfer function of the microphone," and using that transfer function to correct the measured signal. *Id.* at cl 1. The specification explains that this may be accomplished by retrieving device-specific data—such as a model identifier—and using that information to obtain the corresponding transfer function from a database, including an Internet-accessible database. *Id.* at 5:5-19.

25.     Additionally, the specification describes performing signal processing on the measured data to determine how the reproduced audio differs from the intended signal. *See id.* at 3:24-30; 5:20-32. This includes performing spectral analysis and comparing the measured response to an expected or ideal response to compute equalization parameters for the speakers. *See id.* at 4:55-59; cl. 8; cl. 16. The resulting parameters are concrete filter characteristics that are applied within a digital signal processing pipeline to modify audio signals before playback.

26.     The disclosed workflow is implemented through coordinated operation of multiple system components, including a portable device, a microphone, one or more speakers, and a digital signal processor, and may further involve network-based resources, such as a database of microphone transfer functions. *See id.* at 3:3-16; 4:1-16; 5:5-7. Embodiments described in the patents guide the user through a defined sequence of physical interactions—positioning the microphone, initiating playback,

6

capturing signals, and repeating measurements—after which computed calibration parameters are made available to the system for use in future playback. *See id.* at Abstract, Fig. 2, 4:36-53, cl. 1.

27. This architecture enables a capability that prior systems did not achieve— accurate, environment-specific calibration using general-purpose consumer hardware in ordinary listening environments. *See id.* at 2:38-54. The specification emphasizes that the system is designed to be used "without extensive knowledge or experience" and using "devices that the consumers already own," while completing the calibration process in a short and practical timeframe. *Id.* at 2:38-46. In this way, the inventions transform devices that were not previously suitable for precise acoustic measurement into components of a functioning calibration system.

28. The Asserted Patents claim multiple distinct and complementary implementations of related calibration techniques. Certain patents, including the '996, '315, and '340 Patents, require device-specific calibration using microphone transfer functions derived from system information files.

29. For example, the '996 Patent claims a specific, technical calibration technique that uses deliberately overlapped multi-speaker test signals, spatially separated microphone captures, and device-specific "transfer function of the microphone" compensation to extract and isolate overlapping acoustic contributions from different playback sources, rather than treating captured audio as a single, undifferentiated signal. *E.g.*, Ex. 1 ('996 Pat.) at cl. 1. This coordinated pipeline improves the functioning of the system itself by using device-specific acoustic distortions into a feedback-driven calibration loop that determines and "appl[ies] the one or more adjustments" to subsequent audio playback in the physical environment. *E.g.*, *id.* at cl. 1, *see also* 2:30-34.

30. The '315 Patent claims a spatially distributed calibration technique that captures "an audio source" at multiple, distinct physical locations and uses those comparative measurements (along with a device-specific "transfer function of the

microphone") to model location-dependent acoustic effects and compute adjustments applied to subsequent playback. *E.g.*, Ex. 2 ('315 Pat.) at cl. 1. This approach improves system performance by calibrating audio output based on how sound propagates through the environment across space, rather than relying on single-point measurements or abstract analysis.

31.    The '340 Patent claims a calibration architecture that combines multi-location acoustic measurements with externally sourced, device-specific calibration data, including retrieving "the transfer function of the microphone from a remote system" using a "device identifier" via a network system and using that remotely retrieved and speaker-specific data. *E.g.*, Ex. 3 ('340 Pat.) at cl. 1. This approach improves system performance by using integrated data to determine and apply concrete adjustments to subsequent audio playback, resulting in more accurate calibration for the physical environment.

32.    Others, including the '294 and '234 Patents, claim calibration techniques that coordinate interactions among networked speakers and control devices during real-world playback. Still others, such as the '572 Patent, claim these techniques to speaker-initiated and environment-aware calibration processes.

33.    For example, the '294 Patent claims a calibration technique implemented through a "portable electronic device" that actively coordinates the calibration process by "establishing . . . a network connection" with a "speaker system," directing "repositioning . . . within an environment," "initiating playback," and capturing measurements at multiple locations. *E.g.*, Ex. 4 ('294 Pat.) at cl. 1. This approach improves system performance by integrating "user interface" control, network-based playback initiation, and device-specific acoustic measurements into a unified calibration workflow that determines and applies concrete adjustments to subsequent audio playback in the physical environment. *Id.*

34.    The '234 Patent claims a calibration technique that uses a portable device to initiate playback of audio content from an Internet music library and to capture

8

measurements of different portions of that content at multiple locations within the environment. *E.g.*, Ex. 5 ('234 Pat.) at cl. 1. This approach improves system performance by using real-world playback of streaming audio together with device-specific microphone characteristics to determine and apply concrete adjustments to subsequent audio playback, resulting in more accurate sound calibration in the physical environment.

35. The '572 Patent claims a calibration technique that is triggered by "identifi[ed] . . . change[s] in an environment" and performed using "a microphone of the network-connected speaker system" itself, rather than external control device. *E.g.*, Ex. 6 ('572 Pat.) at cl. 1. It identifies environmental characteristics by analyzing playback using pattern-based frequency alignment and comparison against a reference response, and then determines and applies concrete adjustments to subsequent audio playback. This approach improves system performance by enabling automatic, environment-aware calibration that continuously adapts audio output based on detected changes in real-world conditions.

36. The '078 Patent claims a calibration technique in which an electronic device directs successive playback of audio content through a speaker system and captures the resulting sound at different locations within the environment. *E.g.*, Ex. 7 ('078 Pat.) at cl. 1. The method requires initiating distinct playback signals, detecting resulting audio from each of a plurality of speakers at a first location and then at a second location, and determining playback adjustments based on the differences across those location-specific measurements. *Id.* By using separate playback passes and location-specific captures, the claimed method measures how each speaker's output changes across positions in the physical space. This improves system performance by generating playback adjustments based on those measured differences, yielding calibration that reflects actual in-room acoustic behavior.

37. Across the Asserted Patents, the inventions consistently operate on measured physical signals, depend on specific hardware configurations, and produce

calibration parameters that directly alter the operation of the audio system.

38.    The claimed inventions therefore do not recite abstract data processing or mental steps. They require physical emission and detection of acoustic signals, device-specific correction of measured data, and application of computed filter parameters to a playback system to change how that system operates. By doing so, the Asserted Patents provide a concrete technological improvement to audio systems, enabling more accurate sound reproduction in real-world environments.

***Sonos Infringes the Patented Calibration Techniques Through***

***"Trueplay" and Related Features.***

39.    Sonos designs, makes, uses, sells, and offers to sell network-connected speakers and home-audio products marketed on the promise of superior sound quality, including the Era, Five, One, Play, Move, Roam, Ace, Arc, Beam, and Ray line of products.

40.    A central selling point across Sonos's product lines is Trueplay, a room-calibration feature that Sonos promotes as improving audio performance in the listener's actual environment and that Sonos makes available on nearly all of its speakers.



41.    Trueplay is available through the Sonos App, which is distributed by Sonos through mobile application stores on portable devices. Trueplay works by directing a Sonos speaker system to play test tones while a portable device's

microphone (e.g., of an iPhone or iPad) records the resulting audio at multiple positions in the environment. Using those measurements, the Sonos system determines environment-specific adjustments that are then applied to subsequent playback to improve fidelity ("the Trueplay Calibration Process").



42.    Trueplay is available on all Sonos audio products except Port, Connect, and Roam SL.

43.    Trueplay is also supported when Sonos speakers are configured as a stereo pair, surround sound home theater, and when a Sub or Sub Mini has been added. Ex. 9 (Trueplay-compatible devices and Sonos products, https://support.sonos.com/en/article/trueplay-compatible-devices-and-sonos-products).

44.     Sonos also refers to Trueplay as "advanced tuning" for some products, including Arc Ultra, Era 100, and Era 300. The advanced tuning process is the same Trueplay process described above. Ex. 10 (Tune your Arc Ultra, Era 100, or Era 300 with Trueplay, https://support.sonos.com/en/article/tune-your-arc-ultra-era-100-or-era-300-with-trueplay).

45.     Specifically, Sonos products capable of use with Trueplay or "advanced tuning" Trueplay include at least the following: One, One SL, Five, Sonos Play, Play:3, Play:5, Ray, Beam, Arc, Arc SL, Arc Ultra, Sub Mini, Sub, Amp, Era 100, Era 300, Era 100 Pro, Playbar, Playbase, In-Wall and In-Ceiling by Sonance Architectural Speakers, IKEA Symfonisk Bookshelf Speaker, IKEA Symfonisk Speaker Lamp,

IKEA Symfonisk Picture Frame Speaker, IKEA Symfonisk Floor Lamp Speaker (collectively, "Trueplay Accused Products"). In addition, the Sonos Ace in combination with certain of the Trueplay Accused Products is compatible with TrueCinema (collectively, the "TrueCinema Accused Products").

46. Sonos further offers Automatic Trueplay on select speakers equipped with onboard microphones, which detect environmental changes and autonomously recalibrate playback without user intervention. This feature measures the room response with a microphone and applies calculated adjustments within the speaker hardware itself (the "Automatic Trueplay Calibration Process").



47. Automatic Trueplay is available on portable Sonos products, including Move, Move 2, Roam, Roam 2, and Sonos Play. Ex. 11 (Automatic Trueplay, https://support.sonos.com/en/article/automatic-trueplay-tm).

48. Sonos also offers a feature called "quick tuning," which uses the built-in microphone on select Sonos speakers to tune itself for its current location. Quick tuning also works for standalone speakers, stereo-paired Era speakers, or a full home theater setup. Quick tuning is available on Arc Ultra, Era 100, and Era 300 speakers and is compatible for users with both Android and iOS devices. https://support.sonos.com/en/article/tune-your-arc-ultra-era-100-or-era-300-with-trueplay. Exhibit 10.

13



49.     Sonos products capable of use with Automatic Trueplay or quick tuning Trueplay include at least the following: Arc Ultra, Era 100, Era 300, Era 100 Pro, Move, Move 2, Roam, Roam 2, Sonos Play, Ray, Beam, Arc, Arc SL (collectively "Automatic Trueplay Accused Products").

50.     Sonos also offers a feature called TrueCinema, which uses embedded microphones in the Sonos Ace headphones to tune audio based on signals emitted by an associated Sonos sound bar, for use in a particular environment (the "TrueCinema Calibration Process").



14

*Sonos Directs, Controls, and Induces Customers to Use Trueplay and Extensively Tests Trueplay Internally.*

51.    Sonos products ship with software required to perform Trueplay.[2] Sonos also provides software in the form of the Sonos App free to users to allow them to control features of their Sonos systems. The Sonos App is required to set up and use the features of the Sonos products.

52.    Sonos, through the Sonos App, encourages users to begin tuning their speaker system using the Trueplay, Auto Trueplay, or TrueCinema Calibration Processes. Users can only apply the Trueplay method and obtain the benefits of Trueplay if they perform the required steps of the Calibration Processes dictated by Sonos through the Sonos App. During the Calibration Processes, Sonos, through the Sonos App, provides explicit instructions on how to properly perform the required steps:



---

[2] In the following sections, unless stated otherwise, "Trueplay" is used to collectively refer to the infringing features in Sonos's products, including "advanced tuning," "Auto Trueplay," "quick tuning," and "TrueCinema."

53.    Sonos conditions the receipt of the benefit of Trueplay on performance of the steps of the Calibration Processes. Sonos also establishes the manner and timing of that performance.

54.    Sonos encourages customers to use Trueplay and highlights it as a key differentiator across its marketing and product support, reinforcing that Trueplay is integral to the performance and value of Sonos speaker systems.

55.    For example, Sonos's own materials describe Trueplay as a significant feature that supports the majority of Sonos products and enhances the listening experience by tuning for a specific environment. Sonos also advertises Trueplay and Auto Trueplay as "key benefits" of its software in its annual reports to investors. Sonos, Inc., Annual Report (Form 10-K) (2025) at 7; Sonos, Inc., Annual Report (Form 10-K) (2023) at 7; Sonos, Inc., Annual Report (Form 10-K) (2022) at 7.

56.    By designing, making, using, selling, and/or offering to sell speaker systems with Trueplay, advanced tuning, Automatic Trueplay, quick tuning, and TrueCinema, and by directing, instructing, and inducing customers to use these features as described above, Sonos directly and indirectly infringes the Asserted Patents.

### Sonos Knew or Was Willfully Blind to the Asserted Patents and Its Infringement with Trueplay.

57.    Sonos had actual knowledge of, or at minimum was willfully blind to the existence of, the '996 Patent and the other Asserted Patents years before the filing of this action.

58.    Among other things, the patents share a common 2012 specification that expressly contemplates that "[a]ccording to some embodiments, using a portable device such as a smartphone or tablet, a user can calibrate speakers by initiating playback of a test signal, detecting playback of the test signal with the portable device's microphone, and repeating this process for a number of speakers and/or device positions." '996 Pat. at Abstract. The specification specifically identifies Sonos network connected speakers as a situation that could implement the technology claimed

16

in the patents. *Id.* at 2:47-56.

59.     Moreover, Sonos publicly touts Trueplay as a core feature across most of its speaker products and describes it as using a portable device microphone to analyze the room and improve sound quality; Automatic Trueplay performs the same calibration using onboard microphones. Thus, just from the face of the common specification, Sonos was on notice that the patented inventions closely relate to its products and was either aware of or willfully blind to its infringement.

60.     Sonos also had knowledge of U.S. Publication No. 2013/0216071, which issued as the '996 Patent, since at least October 7, 2015. On that date, during prosecution of Sonos's U.S. Application No. 14/216,306, the examiner rejected some of Sonos's proposed claims based on the '071 publication. Sonos then amended certain claims in its patent application and discussed the amendments and the '071 publication in an interview on October 26, 2015. After this, the examiner issued a notice of allowance, and on December 22, 2015, Sonos was issued U.S. Patent No. 9,219,460, citing the '071 publication as a reference on the face of the patent.

61.     Sonos also had knowledge of the '071 publication, which issued as '996 Patent on September 6, 2016, since at least December 6, 2016. After the '996 Patent issued, many patents assigned to Sonos, Inc. continued to cite the '071 publication as a reference. For example, U.S. Patent No. 9,516,419, which issued on December 6, 2016, and U.S. Patent No. 10,582,326, which issued on March 3, 2020, both cite the '071 publication as a reference. The application leading to the 10,582,326 Patent was filed on May 2, 2019, and was a continuation of an application filed August 28, 2018— both years after the '996 Patent issued. Sonos therefore had actual notice of the '996 Patent or was willfully blind to it soon after it issued on September 6, 2016, and no later than December 6, 2016 when its own patent issued citing the application that led to the '996 Patent on its face.

62.     Per the Patent Office's "Patent Public Search," 167 patents assigned to Sonos, Inc. cite the '071 application. The vast majority of these patents both relate to

speaker technology and were issued after the '996 Patent. On information and belief, Sonos had knowledge of both the '996 Patent and had knowledge of, or was willfully blind to, the fact that its Trueplay features on which it sought and received its own patents, infringed the '996 Patent.

63.     On information and belief, Sonos also had knowledge of, or was willfully blind to, the other Asserted Patents based on its knowledge of the '996 Patent. Each of the Asserted Patents shares a common specification and claims priority to the same application. The Asserted Patents issued between 2016 and 2023, and Sonos knew or was willfully blind to the other Asserted Patents because they share a common specification and priority to the same application.

64.     Sonos was also aware of the common specification since at least 2021, when it became highly relevant in Sonos's litigation with Google.

65.     On September 29, 2020, Sonos sued Google in the Western District of Texas for infringing, as relevant here, Sonos's U.S. Patent No. 9,219,460, which, as discussed previously, already cited the '071 publication on its face and was specifically addressed in claim amendments and an examiner interview. *Sonos, Inc. v. Google LLC f/k/a Google Inc.* 6:20-cv-881 (W.D. Tex.) ("*Google Case*").

66.     Sonos's '460 Patent relates directly to Trueplay. For example, Sonos's complaint alleged that the '460 Patent relates to audio calibration technology used by Sonos, specifically "directed to dynamically adjusting the equalization of a playback device based on the environment in which the playback device is operating." *Google Case*, ECF 1 at 22. Sonos also alleged that the '460 Patent "provides an unconventional technological solution" to technology for adjusting an audio player's equalization. *Id.*, ECF 1 at 22-23. As evidence, Sonos attached a third-party review of Sonos speakers. *Id.*, ECF 1-10. That review stated that "Sonos encourages you to calibrate each speaker using the app's built-in TruePlay feature," and that "[t]he selling point" of Sonos's product is the ability to "use the Trueplay feature to tune the sound to your room." *Id.*, ECF 1-10 at 7.

67. On January 8, 2021, Google answered the complaint and specifically alleged that the '460 Patent was invalid based on the '071 publication. That is, at least at the time of Google's answer, Sonos had knowledge of the '996 Patent. All the Asserted Patents share a common specification with the '996 Patent.

68. Sonos was thus on notice at least as early as January 8, 2021, that the '996 Patent could invalidate the '460 Patent, and so conversely, was on notice that the Trueplay features that practice the '460 Patent infringed the '996 Patent.

69. On February 5, 2021, Google filed an IPR petition against Sonos's '460 Patent. IPR2021-00475. Google's primary prior art reference was the same '071 publication. Google argued that the '071 publication anticipated, or at the very least rendered obvious claims from Sonos's patent.

70. Sonos filed a Preliminary Patent Owner Response on December 30, 2021, arguing that the '071 publication did not anticipate the '460 Patent. Sonos argued that it implemented the '460 Patent in multiple speakers, specifically mentioning its Trueplay and Auto Trueplay features as supporting evidence of implementation. IPR2021-00475, ECF 17 at 8, 14-15.

71. The Board instituted the IPR on March 11, 2022. The Board explained that Sonos "fail[ed] to account for the complete disclosure of [the '071 publication] that we determine, at least at this stage of this proceeding, discloses the subject matter of all the limitations of independent claims 1 and 15." IPR2021-00475, ECF 18 at 18.

72. Sonos was thus on notice at least as early as March 11, 2022 that there was a significant risk that the '071 publication anticipated the '460 Patent and, additionally, was on notice of a significant risk that Sonos's Trueplay features infringe the '996 Patent that issued from the '071 publication, along with other patents in the family that had issued as continuations, including the Asserted Patents. Indeed, the '071 publication issued as the '996 Patent on September 6, 2016—years prior—and so Sonos was on notice of a significant risk of infringing the '996 Patent at least as early as March 11, 2022.

19

73.    Sonos fully participated in that IPR. It submitted a preliminary response, a Patent Owner response, and a Patent Owner Sur-Reply; it deposed Google's expert; proffered its own expert testimony; and participated in an oral hearing. A central issue was whether the '071 publication anticipated Sonos's '460 Patent. Sonos thereby gained actual knowledge of the '071 publication, the '996 Patent, and the family's relevance to Trueplay.

74.    On February 15, 2023, the Board determined that the '071 application anticipated claims of the '460 Patent, including independent claims 1 and 15. This confirmed that the '071 disclosure mapped onto the Trueplay functionality Sonos put at issue.

75.    Having learned through the IPR that the '071 application reads on Trueplay and knowing that the Asserted Patents share the same 2012 specification and continuation chain, Sonos recognized a high probability that the '996 Patent and its additional family members likewise covered Trueplay. On information and belief, rather than conduct a reasonable investigation, Sonos chose not to review the family's issued and pending continuations, did not implement any design-around or remedial steps, and continued instructing and promoting Trueplay across its product line. This was despite the IPR record and Sonos's own prosecution citations to the Intertrust family. Sonos's conduct therefore satisfies both prongs of willful blindness: a subjective belief in a high probability that the continuation family covered Trueplay, and deliberate actions to avoid confirming that fact.

76.    Based on the totality of the circumstances above, Sonos knew *for years* of the '996 Patent and its infringement of that patent and was, at minimum, willfully blind to the rest of the family.

77.    Independently, Sonos also received direct, written pre-suit notice of the Asserted Patents and of its infringement by specific Sonos products implementing the infringing features, including advanced tuning, Auto Trueplay, quick tuning, and TrueCinema on March 3, 2026.

20

78.    On March 12, 2026, Sonos acknowledged receipt of the pre-suit notice, but continued its accused conduct.

79.    In light of Sonos's prosecution citations to members of the Intertrust family, its IPR-based knowledge, express written notice via the March 3 communication, Sonos knew—or at minimum, was willfully blind to the high probability—that Trueplay and Automatic Trueplay infringe the Asserted Patents. Sonos nevertheless continued to make, use, sell, and promote its Trueplay-enabled products, demonstrating willful, egregious, deliberate infringement.

## COUNT I
## (INFRINGEMENT OF THE '996 PATENT)

80.    Plaintiff restates and realleges the preceding paragraphs of the Complaint.

81.    Sonos directly infringes the '996 Patent by making, using, selling, offering for sale, and/or importing into the United States the Trueplay Accused Products. Specifically, Sonos's performance of the Trueplay Calibration Process using the Trueplay Accused Products meets every limitation of at least claim 1, and Sonos directly infringes at least claim 1 when performing the Trueplay Calibration Process using the Trueplay Accused Products, in violation of 35 U.S.C. § 271(a). An exemplary claim chart showing one way in which this performance infringes claim 1 is attached as Exhibit 12.

82.    Sonos also directly infringes the '996 Patent by directing and controlling its customers' performance of the Trueplay Calibration Process using the Trueplay Accused Products in a manner that infringes the '996 Patent. As discussed above, Sonos conditions participation in and receipt of the benefit of Trueplay features on the performance of the infringing methods and establishes the manner or timing of that performance.

83.    Sonos also indirectly infringes at least claim 1 of the '996 Patent by inducing infringement under 35 U.S.C. § 271(b). By making, using, selling, offering to sell, and/or importing into the United States the Trueplay Accused Products, as well as

21

by encouraging and instructing users of the Trueplay Accused Products to perform the Trueplay Calibration Process, Sonos specifically intends for its customers and users of the Trueplay Accused Products to perform the patented methods and use the patented systems. Sonos has knowledge that its acts will cause infringement, or Sonos is willfully blind to the fact that its acts will cause infringement.

84. Sonos also indirectly infringes at least claim 1 of the '996 Patent through contributory infringement under 35 U.S.C. § 271(c). Sonos offers to sell and does sell the Trueplay Accused Products within the United States, knowing that use of those products to perform the patented methods constitutes a material part of the claimed invention, knowing that they are especially made or especially adapted for use in infringing the '996 Patent, and knowing that they are not staple articles or commodities of commerce suitable for substantial noninfringing use. At minimum, Sonos is willfully blind.

85. Sonos has had knowledge of the '996 Patent and has continued to directly and indirectly infringe. Specifically, Sonos's knowledge can be measured from the following dates, both individually and under the totality of the circumstances: 1) October 7, 2015, when the application that led to the '996 Patent was cited in an office action rejecting one of Sonos's own patent applications; 2) September 6, 2016, when the '996 Patent issued, mentioning Sonos in the specification and having already been cited in Sonos's patent prosecution; 3) December 6, 2016, when another of Sonos's own patents issued citing to the application that led to the '996 Patent on its face; 4) January 8, 2021, when Google answered Sonos's complaint in the Western District of Texas and asserted that Sonos's own patent was invalid based on the application that led to the '996 Patent; 5) February 5, 2021, when Google filed an IPR Petition asserting that Sonos's own patent was invalid based on the application that led to the '996 Patent; 6) February 15, 2023, when the PTAB found Sonos's own patent invalid based on the application that led to the '996 Patent; and 7) March 3, 2026, when Sonos received written notice of the '996 Patent and Sonos's infringement by products equipped with

Trueplay.

86. Sonos's infringement of the '996 Patent has been willful. As discussed above, Sonos has had knowledge of the '996 Patent for years, and has had knowledge that its Trueplay feature infringes the '996 Patent for years, but has continued to sell the Trueplay Accused Products while knowing of the risk of infringement or in view of the risk of infringement that was sufficiently obvious that it should have been known to Sonos. Despite this risk, Sonos infringes and continues to infringe the '996 Patent in a wanton, malicious, and egregious manner, with reckless disregard for Plaintiff's patent rights, making its infringement willful and subject to enhanced damages under 35 U.S.C. § 284.

## COUNT II
## (INFRINGEMENT OF THE '315 PATENT)

87. Plaintiff restates and realleges the preceding paragraphs of the Complaint.

88. Sonos directly infringes the '315 Patent by making, using, selling, offering for sale, and/or importing into the United States the Trueplay Accused Products. Specifically, Sonos's performance of the Trueplay Calibration Process using the Trueplay Accused Products meets every limitation of at least claim 1, and Sonos directly infringes at least claim 1 when performing the Trueplay Calibration Process using the Trueplay Accused Products, in violation of 35 U.S.C. § 271(a). An exemplary claim chart showing one way in which this performance infringes claim 1 is attached as Exhibit 13.

89. Sonos also directly infringes the '315 Patent by directing and controlling its customers' performance of the Trueplay Calibration Process using the Trueplay Accused Products in a manner that infringes the '315 Patent. As discussed above, Sonos conditions participation in and receipt of the benefit of Trueplay features on the performance of the infringing methods and establishes the manner or timing of that performance.

90. Sonos also indirectly infringes at least claim 1 of the '315 Patent by

inducing infringement under 35 U.S.C. § 271(b). By making, using, selling, offering to sell, and/or importing into the United States the Trueplay Accused Products, as well as by encouraging and instructing users of the Trueplay Accused Products to perform the Trueplay Calibration Process, Sonos specifically intends for its customers and users of the Trueplay Accused Products to perform the patented methods and use the patented systems. Sonos has knowledge that its acts will cause infringement, or Sonos is willfully blind to the fact that its acts will cause infringement.

91.    Sonos also indirectly infringes at least claim 1 of the '315 Patent through contributory infringement under 35 U.S.C. § 271(c). Sonos offers to sell and does sell the Trueplay Accused Products within the United States, knowing that use of those products to perform the patented methods constitutes a material part of the claimed invention, knowing that they are especially made or especially adapted for use in infringing the '315 Patent, and knowing that they are not staple articles or commodities of commerce suitable for substantial noninfringing use. At minimum, Sonos is willfully blind.

92.    Sonos has had knowledge of the '315 Patent and has continued to directly and indirectly infringe. Specifically, Sonos's knowledge can be measured from the following dates, both individually and under the totality of the circumstances: 1) October 7, 2015, when the application that led to the parent '996 Patent was cited in an office action rejecting one of Sonos's own patent applications; 2) September 6, 2016, when the parent '996 Patent issued, mentioning Sonos in the specification and having already been cited in Sonos's patent prosecution; 3) December 6, 2016, when another of Sonos's own patents issued citing to the application that led to the parent '996 Patent on its face; 4) January 30, 2018, when the '315 Patent issued, mentioning Sonos in the specification; 5) January 8, 2021, when Google answered Sonos's complaint in the Western District of Texas and asserted that Sonos's own patent was invalid based on the application that led to the parent '996 Patent; 6) February 5, 2021, when Google filed an IPR Petition asserting that Sonos's own patent was invalid based on the

application that led to the parent '996 Patent; 7) February 15, 2023, when the PTAB found Sonos's own patent invalid based on the application that led to the parent '996 Patent; and 8) March 3, 2026, when Sonos received written notice of the '315 Patent and Sonos's infringement by products equipped with Trueplay.

93.    Sonos's infringement of the '315 Patent has been willful. As discussed above, Sonos has had knowledge of the '315 Patent for years, and has had knowledge that its Trueplay feature infringes the '315 Patent for years, and has continued to sell the Trueplay Accused Products while knowing of the risk of infringement or in view of the risk of infringement that was sufficiently obvious that it should have been known to Sonos. Despite this risk, Sonos infringes and continues to infringe the '315 Patent in a wanton, malicious, and egregious manner, with reckless disregard for Plaintiff's patent rights, making its infringement willful and subject to enhanced damages under 35 U.S.C. § 284.

## COUNT III
### (Infringement of the '340 Patent)

94.    Plaintiff restates and realleges the preceding paragraphs of the Complaint.

95.    Sonos directly infringes the '340 Patent by making, using, selling, offering for sale, and/or importing into the United States the Trueplay Accused Products. Specifically, Sonos's performance of the Trueplay Calibration Process using the Trueplay Accused Products meets every limitation of at least claim 1, and Sonos directly infringes at least claim 1 when performing the Trueplay Calibration Process using the Trueplay Accused Products, in violation of 35 U.S.C. § 271(a). An exemplary claim chart showing one way in which this performance infringes claim 1 is attached as Exhibit 14.

96.    Sonos also directly infringes the '340 Patent by directing and controlling its customers' performance of the Trueplay Calibration Process using the Trueplay Accused Products in a manner that infringes the '340 Patent. As discussed above, Sonos conditions participation in and receipt of the benefit of Trueplay features on the

performance of the infringing methods and establishes the manner or timing of that performance.

97.    Sonos also indirectly infringes at least claim 1 of the '340 Patent by inducing infringement under 35 U.S.C. § 271(b). By making, using, selling, offering to sell, and/or importing into the United States the Trueplay Accused Products, as well as by encouraging and instructing users of the Trueplay Accused Products to perform the Trueplay Calibration Process, Sonos specifically intends for its customers and users of the Trueplay Accused Products to perform the patented methods and use the patented systems. Sonos has knowledge that its acts will cause infringement, or Sonos is willfully blind to the fact that its acts will cause infringement.

98.    Sonos also indirectly infringes at least claim 1 of the '340 Patent through contributory infringement under 35 U.S.C. § 271(c). Sonos offers to sell and does sell the Trueplay Accused Products within the United States, knowing that use of those products to perform the patented methods constitutes a material part of the claimed invention, knowing that they are especially made or especially adapted for use in infringing the '340 Patent, and knowing that they are not staple articles or commodities of commerce suitable for substantial noninfringing use. At minimum, Sonos is willfully blind.

99.    Sonos has had knowledge of the '340 Patent and has continued to directly and indirectly infringe. Specifically, Sonos's knowledge can be measured from the following dates, both individually and under the totality of the circumstances: 1) October 7, 2015, when the application that led to the parent '996 Patent was cited in an office action rejecting one of Sonos's own patent applications; 2) September 6, 2016, when the parent '996 Patent issued, mentioning Sonos in the specification and having already been cited in Sonos's patent prosecution; 3) December 6, 2016, when another of Sonos's own patents issued citing to the application that led to the parent '996 Patent on its face; 4) March 26, 2019, when the '340 Patent issued, mentioning Sonos in the specification; 5) January 8, 2021, when Google answered Sonos's complaint in the

26

Western District of Texas and asserted that Sonos's own patent was invalid based on the application that led to the parent '996 Patent; 6) February 5, 2021, when Google filed an IPR Petition asserting that Sonos's own patent was invalid based on the application that led to the parent '996 Patent; 7) February 15, 2023, when the PTAB found Sonos's own patent invalid based on the application that led to the parent '996 Patent; and 8) March 3, 2026, when Sonos received written notice of the '340 Patent and Sonos's infringement by products equipped with Trueplay.

100.   Sonos's infringement of the '340 Patent has been willful. As discussed above, Sonos has had knowledge of the '340 Patent for years, and has had knowledge that its Trueplay feature infringes the '340 Patent for years, and has continued to sell the Trueplay Accused Products while knowing of the risk of infringement or in view of the risk of infringement that was sufficiently obvious that it should have been known to Sonos. Despite this risk, Sonos infringes and continues to infringe the '340 Patent in a wanton, malicious, and egregious manner, with reckless disregard for Plaintiff's patent rights, making its infringement willful and subject to enhanced damages under 35 U.S.C. § 284.

## COUNT IV
### (Infringement of the '294 Patent)

101.   Plaintiff restates and realleges the preceding paragraphs of the Complaint.

102.   Sonos directly infringes the '294 Patent by making, using, selling, offering for sale, and/or importing into the United States the Trueplay Accused Products. Specifically, Sonos's performance of the Trueplay Calibration Process using the Trueplay Accused Products meets every limitation of at least claim 11, and Sonos directly infringes at least claim 11 when performing the Trueplay Calibration Process using the Trueplay Accused Products, in violation of 35 U.S.C. § 271(a). An exemplary claim chart showing one way in which this performance infringes claim 11 is attached as Exhibit 15.

103.   Sonos also directly infringes the '294 Patent by directing and controlling

27

its customers' performance of the Trueplay Calibration Process using the Trueplay Accused Products in a manner that infringes the '294 Patent. As discussed above, Sonos conditions participation in and receipt of the benefit of Trueplay features on the performance of the infringing methods and establishes the manner or timing of that performance.

104.   Sonos also indirectly infringes at least claim 11 of the '294 Patent by inducing infringement under 35 U.S.C. § 271(b). By making, using, selling, offering to sell, and/or importing into the United States the Trueplay Accused Products, as well as by encouraging and instructing users of the Trueplay Accused Products to perform the Trueplay Calibration Process, Sonos specifically intends for its customers and users of the Trueplay Accused Products to perform the patented methods and use the patented systems. Sonos has knowledge that its acts will cause infringement, or Sonos is willfully blind to the fact that its acts will cause infringement.

105.   Sonos also indirectly infringes at least claim 11 of the '294 Patent through contributory infringement under 35 U.S.C. § 271(c). Sonos offers to sell and does sell the Trueplay Accused Products within the United States, knowing that use of those products to perform the patented methods constitutes a material part of the claimed invention, knowing that they are especially made or especially adapted for use in infringing the '294 Patent, and knowing that they are not staple articles or commodities of commerce suitable for substantial noninfringing use. At minimum, Sonos is willfully blind.

106.   Sonos has had knowledge of the '294 Patent and has continued to directly and indirectly infringe. Specifically, Sonos's knowledge can be measured from the following dates, both individually and under the totality of the circumstances: 1) October 7, 2015, when the application that led to the parent '996 Patent was cited in an office action rejecting one of Sonos's own patent applications; 2) September 6, 2016, when the parent '996 Patent issued, mentioning Sonos in the specification and having already been cited in Sonos's patent prosecution; 3) December 6, 2016, when another

28

of Sonos's own patents issued citing to the application that led to the parent '996 Patent on its face; 4) November 3, 2020, when the '294 Patent issued, mentioning Sonos in the specification; 5) January 8, 2021, when Google answered Sonos's complaint in the Western District of Texas and asserted that Sonos's own patent was invalid based on the application that led to the parent '996 Patent; 6) February 5, 2021, when Google filed an IPR Petition asserting that Sonos's own patent was invalid based on the application that led to the parent '996 Patent; 7) February 15, 2023, when the PTAB found Sonos's own patent invalid based on the application that led to the parent '996 Patent; and 8) March 3, 2026, when Sonos received written notice of the '294 Patent and Sonos's infringement by products equipped with Trueplay.

107.    Sonos's infringement of the '294 Patent has been willful. As discussed above, Sonos has had knowledge of the '294 Patent for years, and has had knowledge that its Trueplay feature infringes the '294 Patent for years, and has continued to sell the Trueplay Accused Products while knowing of the risk of infringement or in view of the risk of infringement that was sufficiently obvious that it should have been known to Sonos. Despite this risk, Sonos infringes and continues to infringe the '294 Patent in a wanton, malicious, and egregious manner, with reckless disregard for Plaintiff's patent rights, making its infringement willful and subject to enhanced damages under 35 U.S.C. § 284.

## COUNT V

### (Infringement of the '234 Patent)

108.    Plaintiff restates and realleges the preceding paragraphs of the Complaint.

109.    Sonos directly infringes the '234 Patent by making, using, selling, offering for sale, and/or importing into the United States the Trueplay Accused Products. Specifically, Sonos's performance of the Trueplay Calibration Process using the Trueplay Accused Products meets every limitation of at least claim 1, and Sonos directly infringes at least claim 1 when performing the Trueplay Calibration Process using the Trueplay Accused Products, in violation of 35 U.S.C. § 271(a). An exemplary

claim chart showing one way in which this performance infringes claim 1 is attached as Exhibit 16.

110. Sonos also directly infringes the '234 Patent by directing and controlling its customers' performance of the Trueplay Calibration Process using the Trueplay Accused Products in a manner that infringes the '234 Patent. As discussed above, Sonos conditions participation in and receipt of the benefit of Trueplay features on the performance of the infringing methods and establishes the manner or timing of that performance.

111. Sonos also indirectly infringes at least claim 1 of the '234 Patent by inducing infringement under 35 U.S.C. § 271(b). By making, using, selling, offering to sell, and/or importing into the United States the Trueplay Accused Products, as well as by encouraging and instructing users of the Trueplay Accused Products to perform the Trueplay Calibration Process, Sonos specifically intends for its customers and users of the Trueplay Accused Products to perform the patented methods. Sonos has knowledge that its acts will cause infringement, or Sonos is willfully blind to the fact that its acts will cause infringement.

112. Sonos also indirectly infringes at least claim 1 of the '234 Patent through contributory infringement under 35 U.S.C. § 271(c). Sonos offers to sell and does sell the Trueplay Accused Products within the United States, knowing that use of those products to perform the patented methods constitutes a material part of the claimed invention, knowing that they are especially made or especially adapted for use in infringing the '234 Patent, and knowing that they are not staple articles or commodities of commerce suitable for substantial noninfringing use. At minimum, Sonos is willfully blind.

113. Sonos has had knowledge of the '234 Patent and has continued to directly and indirectly infringe. Specifically, Sonos's knowledge can be measured from the following dates, both individually and under the totality of the circumstances: 1) October 7, 2015, when the application that led to the parent '996 Patent was cited in an

office action rejecting one of Sonos's own patent applications; 2) September 6, 2016, when the parent '996 Patent issued, mentioning Sonos in the specification and having already been cited in Sonos's patent prosecution; 3) December 6, 2016, when another of Sonos's own patents issued citing to the application that led to the parent '996 Patent on its face; 4) January 8, 2021, when Google answered Sonos's complaint in the Western District of Texas and asserted that Sonos's own patent was invalid based on the application that led to the parent '996 Patent; 5) February 5, 2021, when Google filed an IPR Petition asserting that Sonos's own patent was invalid based on the application that led to the parent '996 Patent; 6) May 31, 2022, when the '234 Patent issued, mentioning Sonos in the specification; 7) February 15, 2023, when the PTAB found Sonos's own patent invalid based on the application that led to the parent '996 Patent; and 8) March 3, 2026, when Sonos received written notice of the '234 Patent and Sonos's infringement by products equipped with Trueplay.

114.    Sonos's infringement of the '234 Patent has been willful. As discussed above, Sonos has had knowledge of the '234 Patent for years, and has had knowledge that its Trueplay feature infringes the '234 Patent for years, and has continued to sell the Trueplay Accused Products while knowing of the risk of infringement or in view of the risk of infringement that was sufficiently obvious that it should have been known to Sonos. Despite this risk, Sonos infringes and continues to infringe the '234 Patent in a wanton, malicious, and egregious manner, with reckless disregard for Plaintiff's patent rights, making its infringement willful and subject to enhanced damages under 35 U.S.C. § 284.

## COUNT VI
### (Infringement of the '572 Patent)

115.    Plaintiff restates and realleges the preceding paragraphs of the Complaint.

116.    Sonos directly infringes the '572 Patent by making, using, selling, offering for sale, and/or importing into the United States the Automatic Trueplay Accused Products and TrueCinema Accused Products. Specifically, Sonos's performance of the

Automatic Trueplay Calibration Process using the Automatic Trueplay Accused Products, and Sonos's performance of the TrueCinema Calibration Process using the TrueCinema Accused Products meet every limitation of at least claim 1, and Sonos directly infringes at least claim 1 when performing the Automatic Trueplay Calibration Process using the Automatic Trueplay Accused Products and the TrueCinema Calibration Process using the TrueCinema Accused Products, in violation of 35 U.S.C. § 271(a). Exemplary claim charts showing ways in which this performance infringes claim 1 are attached as Exhibits 17 and 18.

117.   Sonos also directly infringes the '572 Patent by directing and controlling its customers' performance of the Automatic Trueplay Calibration Process using the Automatic Trueplay Accused Products and the TrueCinema Calibration Processes using the TrueCinema Accused Products in a manner that infringes the '572 Patent. As discussed above, Sonos conditions participation in and receipt of the benefit of Trueplay features on the performance of the infringing methods and establishes the manner or timing of that performance.

118.   Sonos also indirectly infringes at least claim 1 of the '572 Patent by inducing infringement under 35 U.S.C. § 271(b). By making, using, selling, offering to sell, and/or importing into the United States the Automatic Trueplay Accused Products and TrueCinema Accused Products, as well as by encouraging and instructing users of the Automatic Trueplay Accused Products and TrueCinema Accused Products to perform the Calibration Processes, Sonos specifically intends for its customers and users of the Automatic Trueplay Accused Products and TrueCinema Accused Products to perform the patented methods. Sonos has knowledge that its acts will cause infringement, or Sonos is willfully blind to the fact that its acts will cause infringement.

119.   Sonos also indirectly infringes at least claim 1 of the '572 Patent through contributory infringement under 35 U.S.C. § 271(c). Sonos offers to sell and does sell the Automatic Trueplay Accused Products and TrueCinema Accused Products within the United States, knowing that use of those products to perform the patented methods

constitutes a material part of the claimed invention, knowing that they are especially made or especially adapted for use in infringing the '572 Patent, and knowing that they are not staple articles or commodities of commerce suitable for substantial noninfringing use. At minimum, Sonos is willfully blind.

120.    Sonos has had knowledge of the '572 Patent and has continued to directly and indirectly infringe. Specifically, Sonos's knowledge can be measured from the following dates, both individually and under the totality of the circumstances: 1) October 7, 2015, when the application that led to the parent '996 Patent was cited in an office action rejecting one of Sonos's own patent applications; 2) September 6, 2016, when the parent '996 Patent issued, mentioning Sonos in the specification and having already been cited in Sonos's patent prosecution; 3) December 6, 2016, when another of Sonos's own patents issued citing to the application that led to the parent '996 Patent on its face; 4) January 8, 2021, when Google answered Sonos's complaint in the Western District of Texas and asserted that Sonos's own patent was invalid based on the application that led to the parent '996 Patent; 5) February 5, 2021, when Google filed an IPR Petition asserting that Sonos's own patent was invalid based on the application that led to the parent '996 Patent; 6) February 15, 2023, when the PTAB found Sonos's own patent invalid based on the application that led to the parent '996 Patent; 7) August 15, 2023 when the '572 Patent issued, mentioning Sonos in the specification; and 8) March 3, 2026, when Sonos received written notice of the '572 Patent and Sonos's infringement by products equipped with Trueplay.

121.    Sonos's infringement of the '572 Patent has been willful. As discussed above, Sonos has had knowledge of the '572 Patent for years, and has had knowledge that its Trueplay feature infringes the '572 Patent for years, and has continued to sell the Automatic Trueplay Accused Products and TrueCinema Accused Products while knowing of the risk of infringement or in view of the risk of infringement that was sufficiently obvious that it should have been known to Sonos. Despite this risk, Sonos infringes and continues to infringe the '572 Patent in a wanton, malicious, and

egregious manner, with reckless disregard for Plaintiff's patent rights, making its infringement willful and subject to enhanced damages under 35 U.S.C. § 284.

## COUNT VII

### (Infringement of the '078 Patent)

122. Plaintiff restates and realleges the preceding paragraphs of the Complaint.

123. Sonos directly infringes the '078 Patent by making, using, selling, offering for sale, and/or importing into the United States the Trueplay Accused Products. Specifically, Sonos's performance of the Trueplay Calibration Process using the Trueplay Accused Products meets every limitation of at least claim 1, and Sonos directly infringes at least claim 1 when performing the Trueplay Calibration Process using the Trueplay Accused Products, in violation of 35 U.S.C. § 271(a). An exemplary claim chart showing one way in which this performance infringes claim 1 is attached as Exhibit 19.

124. Sonos also directly infringes the '078 Patent by directing and controlling its customers' performance of the Trueplay Calibration Process using the Trueplay Accused Products in a manner that infringes the '078 Patent. As discussed above, Sonos conditions participation in and receipt of the benefit of Trueplay features on the performance of the infringing methods and establishes the manner or timing of that performance.

125. Sonos also indirectly infringes at least claim 1 of the '078 Patent by inducing infringement under 35 U.S.C. § 271(b). By making, using, selling, offering to sell, and/or importing into the United States the Trueplay Accused Products, as well as by encouraging and instructing users of the Trueplay Accused Products to perform the Trueplay Calibration Process, Sonos specifically intends for its customers and users of the Trueplay Accused Products to perform the patented methods. Sonos has knowledge that its acts will cause infringement, or Sonos is willfully blind to the fact that its acts will cause infringement.

126. Sonos also indirectly infringes at least claim 1 of the '078 Patent through

34

contributory infringement under 35 U.S.C. § 271(c). Sonos offers to sell and does sell the Trueplay Accused Products within the United States, knowing that use of those products to perform the patented methods constitutes a material part of the claimed invention, knowing that they are especially made or especially adapted for use in infringing the '078 Patent, and knowing that they are not staple articles or commodities of commerce suitable for substantial noninfringing use. At minimum, Sonos is willfully blind.

127.   Sonos has had knowledge of the '078 Patent and has continued to directly and indirectly infringe. Specifically, Sonos's knowledge can be measured from the following dates, both individually and under the totality of the circumstances: 1) October 7, 2015, when the application that led to the parent '996 Patent was cited in an office action rejecting one of Sonos's own patent applications; 2) September 6, 2016, when the parent '996 Patent issued, mentioning Sonos in the specification and having already been cited in Sonos's patent prosecution; 3) December 6, 2016, when another of Sonos's own patents issued citing to the application that led to the parent '996 Patent on its face; 4) January 8, 2021, when Google answered Sonos's complaint in the Western District of Texas and asserted that Sonos's own patent was invalid based on the application that led to the parent '996 Patent; 5) February 5, 2021, when Google filed an IPR Petition asserting that Sonos's own patent was invalid based on the application that led to the parent '996 Patent; 6) February 15, 2023, when the PTAB found Sonos's own patent invalid based on the application that led to the parent '996 Patent; 7) December 31, 2024, when the '078 Patent issued, mentioning Sonos in the specification; and 8) March 3, 2026, when Sonos received written notice of the '078 Patent and Sonos's infringement by products equipped with Trueplay.

128.   Sonos's infringement of the '078 Patent has been willful. As discussed above, Sonos has had knowledge of the '078 Patent for years, and has had knowledge that its Trueplay feature infringes the '078 Patent for years, and has continued to sell the Trueplay Accused Products while knowing of the risk of infringement or in view

of the risk of infringement that was sufficiently obvious that it should have been known to Sonos. Despite this risk, Sonos infringes and continues to infringe the '078 Patent in a wanton, malicious, and egregious manner, with reckless disregard for Plaintiff's patent rights, making its infringement willful and subject to enhanced damages under 35 U.S.C. § 284.

## PRAYER FOR RELIEF

Plaintiff prays for judgment against Sonos as follows:

A.    That Sonos has infringed each of the Asserted Patents, and unless enjoined, will continue to infringe the Asserted Patents;

B.    That Sonos's infringement of the Asserted Patents has been willful;

C.    That Sonos pay Plaintiff's damages adequate to compensate Plaintiff for Sonos's past, present, and future infringement of each of the Asserted Patents, together with interest and costs under 35 U.S.C. § 284;

D.    That Sonos pay Plaintiff pre-judgment and post-judgment interest on the damages assessed;

E.    That Sonos pay Plaintiff enhanced damages pursuant to 35 U.S.C. § 284;

F.    That Sonos be enjoined from infringing the Asserted Patents, or if its infringement is not enjoined, that Sonos be ordered to pay ongoing damages to Plaintiff for any post-judgment infringement of the Asserted Patents;

G.    That this is an exceptional case under 35 U.S.C. § 285;

H.    That Sonos pay Plaintiff's attorneys' fees and costs in this action; and

I.    That Plaintiff be awarded such other and further relief, including equitable relief, as this Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all issues triable to a jury under Federal Rule of Civil Procedure 38(b).

Dated: May 21, 2026

Respectfully submitted,

*/s/ Matthew G. Berkowitz*

Matthew G. Berkowitz (SBN 268873)
 mberkowitz@reichmanjorgensen.com
Michael M. Polka (SBN 351136)
 mpolka@reichmanjorgensen.com
REICHMAN JORGENSEN
 LEHMAN & FELDBERG LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
Tel.: (650) 623-1401; Fax: (650) 560-3501

Timothy A. Trost (SBN 340843)
 ttrost@reichmanjorgensen.com
REICHMAN JORGENSEN
 LEHMAN & FELDBERG LLP
3020 Old Ranch Parkway, Suite 300
Seal Beach, CA 90740
Tel: (650) 623-1401

Connor S. Houghton (*pro hac vice*
 forthcoming)
 choughton@reichmanjorgensen.com
Savannah Carnes (SBN 335438)
 scarnes@reichmanjorgensen.com
Natalie Griffin (*pro hac vice* forthcoming)
 ngriffin@reichmanjorgensen.com
REICHMAN JORGENSEN LEHMAN &
 FELDBERG LLP
1909 K Street, N.W., Suite 800
Washington, D.C. 20006
Tel.: (202) 894-7310

*Attorneys for Plaintiff Crestwood I-A LLC*

37